**ᗺORIGINAL**

USDC
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: APR 1 5 2011

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA     :    <u>INFORMATION</u>

    - v. -     :    11 Cr. ___ (DLC)

RALPH ESMERIAN,

      Defendant.    :

**11 CRIM 347**

- - - - - - - - - - - - - - - - x



### <u>COUNT ONE</u>
**(Bankruptcy Fraud)**

The United States Attorney charges:

### <u>Introduction</u>

1.    At all times relevant to this Information, RALPH ESMERIAN, the defendant, was a dealer and collector of museum-quality jewelry, art, and other valuable objects.

2.    In or about November 2005 and March 2006, RALPH ESMERIAN, the defendant, borrowed, through entities that he owned and controlled, at least approximately $177 million in total from Merrill Lynch Mortgage Capital, Inc. ("Merrill Lynch") for the purpose of, among other things, financing his business operations and buying Fred Leighton LLC, a high-end jewelry retailer, and related entities (together with Fred Leighton Holdings, Inc., "Fred Leighton").

3.    Beginning in or about June 2006 and thereafter, without notice to Merrill Lynch, ESMERIAN sold and double-pledged collateral previously pledged to Merrill Lynch to third parties

for the purpose of, among other things, obtaining other loans, including a $40 million loan from Acorn Capital Group LLC ("Acorn").

      4.   On or about April 15, 2008, ESMERIAN caused Fred Leighton and several related entities to file for bankruptcy protection.  Thereafter, ESMERIAN repeatedly embezzled property belonging to Fred Leighton and other debtor entities, sold it, and kept the proceeds for his own use and other improper uses. For instance, as described in more detail below, in or about May 2008, ESMERIAN secretly sold a $2.45 million item of debtor property (and Merrill Lynch collateral) known as the "Endymion Butterfly Brooch," and kept the proceeds for himself.  After Merrill Lynch discovered this theft, ESMERIAN quickly raised the funds required to secure the return of the Endymion Butterfly Brooch by stealing additional debtor property valued at approximately $9.9 million and selling it at a fraction of that value.

      5.   From April 2008 through in or about November 2009, in the course of the Fred Leighton bankruptcy proceedings, ESMERIAN lied to the Bankruptcy Court and his creditors in sworn deposition testimony, sworn affidavits, and other documents concerning his embezzlement of debtor property, his double-pledging of collateral, and other subjects.

### The Defendant and Other Entities

6.   At all times relevant to this Information, RALPH ESMERIAN, the defendant, was the sole operator and majority owner of R. Esmerian, Inc. ("REI"), a privately-held corporation with its principal place of business in New York, New York, through which ESMERIAN acted as a wholesale dealer in museum-quality jewelry and rare artifacts.

7.   At all times relevant to this Information, Fred Leighton was a luxury retail jeweler with its flagship store in New York, New York.

8.   At all times relevant to this Information, Merrill Lynch was a Delaware corporation that engaged in the business, among other things, of making secured loans to businesses.

9.   At all times relevant to this Information, Acorn was a privately held investment management company with its principal place of business in Greenwich, Connecticut.

### Esmerian's Purchase of Fred Leighton

10.   Beginning in at least 2005, RALPH ESMERIAN, the defendant, sought to expand his business operations by, among other things, purchasing Fred Leighton as a retail outlet for REI's valuable inventory, which ESMERIAN estimated to be worth approximately $192.3 million as of in or about December 2006.

11.   To finance the purchase of Fred Leighton and REI's business operations, on or about November 4, 2005 and March 29,

3

2006, ESMERIAN caused entities that he owned and controlled to borrow approximately $177 million in two loans from Merrill Lynch ("the Merrill Lynch Loans").  The Merrill Lynch Loans were secured by, among other things, the inventory of Fred Leighton and valuable collections of jewelry, antiques, and artifacts that ESMERIAN represented that he owned free and clear of any liens or encumbrances, and which he pledged to Merrill Lynch through agreements (the "Merrill Lynch Agreements") that specified each individual item of collateral (together with additional collateral that ESMERIAN pledged in or about April 2007 and thereafter, the "Merrill Lynch Collateral").  Among other things, the Merrill Lynch Agreements prohibited ESMERIAN from pledging the Merrill Lynch Collateral to third parties without notice to Merrill Lynch, and placed restrictions on ESMERIAN's ability to sell or transfer the Merrill Lynch Collateral.

12.  In connection with the negotiation and execution of the Merrill Lynch Loans and thereafter, RALPH ESMERIAN, the defendant, was represented by a team of advisors, including an accountant (hereinafter, "Accountant-1"), a business advisor ("Business Advisor-1") and an attorney.

13.  As set forth in greater detail below, unbeknownst to Merrill Lynch, at the time RALPH ESMERIAN, the defendant, entered into the Merrill Lynch Agreements, ESMERIAN had already sold and retained the proceeds of, or pledged to third parties,

4

certain items of Merrill Lynch Collateral, in violation of the
Merrill Lynch Agreements.  Thereafter, also unbeknownst to
Merrill Lynch and without informing Merrill Lynch, ESMERIAN
secretly continued to pledge certain items of Merrill Lynch
Collateral to third party creditors and to sell certain items of
Merrill Lynch Collateral and retain the proceeds for his personal
use and other improper uses.

### Merrill Lynch Collateral Sold to Third Parties Prior to Execution of the Merrill Lynch Agreements

14.   For example, before RALPH ESMERIAN, the defendant,
entered into the Merrill Lynch Agreements, he had already sold to
third parties the following Merrill Lynch Collateral, which
ESMERIAN represented to Merrill Lynch to have the following
values based on historical cost (except for the last three items
listed below, the values of which were based on an expert
appraisal commissioned by ESMERIAN in connection with the Merrill
Lynch Loans):

| Inventory Number | Description | Approximate Value |
|---|---|---|
| Tango NA1109 | Platinum jeweled American flag bow knot pin | $12,500 |
| Tango M10643 | Platinum diamond snake bracelet with ruby eyes, circa 1935 | $12,000 |
| Endymion MP3356R | Emerald and diamond bar clips | $59,500 |
| Tango M10001 | Victorian faceted garnet set | $13,900 |

| | | |
|---|---|---|
| Tango M11362 | 18K Gold and Platinum Hexagonal | $15,000 |
| Tango M11894 | Platinum diamond necklace with Marquise Diamond and Emerald center | $34,000 |
| Tango M10566 | 14K yellow gold handchased snake ring with round catseye | $32,500 |
| Tango M11240 | Fox tail chain flower brooch | $1,950 |
| Tango M11611 | Yellow gold & nephrite link bracelet | $3,000 |
| Tango M11637 | 18K yellow gold scattered heart motif ring French | $1,750 |
| Tango M11705 | Bulgari twin pearl and diamond gold ring | $2,000 |
| Tango M11763 | Platinum onyx, emerald and diamond brooch French circa 1925 | $4,500 |
| Tango NA2625 | 18K yellow gold enamel opal and diamond angel fish brooch | $3,500 |
| Tango M06539 | Platinum art deco engraved coral ribbed onyx and diamond brooch by Van Cleef | $32,500 |
| Tango M10056 | Plat. Brooch w/cab. Em., sapp., ruby, diam., & crystal fruit salad | $10,000 |
| Tango M11708 | Platinum natural pearl and diamond cluster ring by Winston | $7,500 |
| Tango M11752 | Platinum diamond necklace | $6,000 |
| Tango M11883 | Platinum lozenge shape Fillgree brooch circa 1918 | $7,800 |
| Tango M12092 | Platinum carved jade and diamond brooch | $7,500 |

| Tango M09617 | Antique silver top yellow gold birds and branch pin circa 1880 | $4,250 |
|---|---|---|
| Tango M11937 | Platinum diamond cross with chain French circa 1910 | $12,500 |
| Tango M11920 | Platinum diamond necklace with tassel motif pendant circa 1925 | $18,500 |
| Tango M12227 | 18K rose gold diamond link bracelet 1940s | $4,950 |
| Tango M12504 | Platinum diamond ring | $11,000 |
| Tango M12499 | Platinum enamel jeweled bunny fisherman brooch by Raymond Yard | $25,000 |
| Tango M12003 | Platinum crystal, jade and diamond art deco brooch | $5,000 |
| Tango M12310 | 14K yellow gold moonstone and sapphire brooch, Tiffany and Company | $3,500 |

| Tango M12429 | Platinum carved crystal, onyx and diamond bow pin by Marcus | $7,000 |
|---|---|---|
| Tango M12473 | Antique blue enamel butterfly brooch | $5,000 |
| Tango M12629 | Platinum sapphire and diamond bracelet Van Cleeg and Arpels 1936 | $160,000 |
| Tango M11405 | 14K textured yellow gold jeweled charm "Love & Marriage" cuff bracelet | $6,500 |
| Tango M11845 | Platinum diamond bowknot brooch by Cartier 1925 | $12,000 |
| Calypso C56 | Twilight Landscape Comb | $450,000 (value based on expert appraisal) |

| Calypso 83 | Art deco rose bracelet by Van Cleef and Arpels 1925 | $2 million (value based on expert appraisal) |
| Calypso 95 | Diamond rosebud bracelet by Paul Flato circa 1935 | $500,000 (value based on expert appraisal) |
| Total: | | $3,492,600 |

### The Jeweled Objects Transaction and ESMERIAN's Embezzlement of the Jeweled Objects Emerald Ring

15.  Additionally, in or about June 2006, unbeknownst to Merrill Lynch, RALPH ESMERIAN, the defendant, caused REI to sell 38 particular items of jewelry and other objects to Jeweled Objects LLC, a company owned, in part, and controlled by Accountant-1 and Business Advisor-1 (the "Jeweled Objects Transaction").  In connection with the Jeweled Objects Transaction, ESMERIAN represented to Jeweled Objects that REI owned all such 38 items free and clear of any liens, encumbrances, and other restrictions (the "Jeweled Objects Representations").  In fact, in violation of the Merrill Lynch Agreements and the Jeweled Objects Representations, six of the 38 items that ESMERIAN sold to Jeweled Objects were Merrill Lynch Collateral, which ESMERIAN had represented to Merrill Lynch to have the following approximate values based on historical cost:

| Inventory Number | Description | Approximate Value |
| --- | --- | --- |
| Tango M10427 | Yellow Gold Victorian Jeweled Peacock Brooch, circa 1880 (Jeweled Objects No. 32). | $33,000 |

| Tango M11418 | Platinum and 18K Yellow Gold Canary and Colorless Diamond Bird (Jeweled Objects No. 33) | $57,500 |
| Tango M08212 | Platinum Diamond Cupid Brooch by Van Cleef and Arpel (Jeweled Objects No. 34) | $125,000 |
| Tango NA.2165 | Victorian Red Enamel Snake Bracelet with 3 Fancy Cut Emeralds and Old Mine Di (Jeweled Objects No. 35) | $100,000 |
| Endymion MP 3440 | Platinum and Pink Gold Peridot and Pink Diamonds Starfish (Jeweled Objects No. 36) | $595,000 |
| Endymion MP 3467 | Platinum and 18 Kt. Yellow Gold Three Row Emerald Cut Stone (Jeweled Objects No. 38) | $700,000 |
| **Total Value** | | **$1,610,500** |

16.   Among the other 32 objects that REI sold as part of the Jeweled Objects Transaction was a 9.77 Carat Emerald Ring (hereinafter "the Jeweled Objects Emerald Ring").  On or about February 26, 2008, Jeweled Objects consigned the Jeweled Objects Emerald Ring to ESMERIAN so that he could, acting as Jeweled Objects's agent, sell it to a third party.  On or about May 28, 2009, ESMERIAN advised Accountant-1 that he had sold the Jeweled Objects Emerald Ring to a private individual (hereinafter, "Individual-1") for $250,000, and that ESMERIAN would remit the $250,000 to Jeweled Objects.  ESMERIAN gave Accountant-1 a handwritten invoice purporting to show the sale of the Jeweled Objects Emerald Ring to Individual-1.

17.  Despite his statements to Accountant-1, RALPH ESMERIAN, the defendant, never remitted to Jeweled Objects any of the proceeds of the sale of the Jeweled Objects Emerald Ring.  In fact, despite ESMERIAN's handwritten invoice purporting to memorialize the sale, Individual-1 never bought or even considered buying the Jeweled Objects Emerald Ring.  ESMERIAN never disclosed the true purchaser and whereabouts of the Jeweled Objects Emerald Ring.

## The New York State Supreme Court's Temporary Restraining Order and ESMERIAN's Continued Embezzlement

18.  Following the commencement of certain litigation between Merrill Lynch and RALPH ESMERIAN, the defendant, on or about January 8, 2008, the New York State Supreme Court issued a temporary restraining order (the "State Court TRO") prohibiting ESMERIAN and REI from selling or transferring certain specified items of Merrill Lynch Collateral.  ESMERIAN repeatedly violated the State Court TRO by secretly selling certain Merrill Lynch Collateral and retaining the proceeds of such sales for his personal use and other improper uses.

19.  During in or about February and March 2008, in violation of the Merrill Lynch Agreements, and without notice to Merrill Lynch, RALPH ESMERIAN, the defendant, sold the following items of Merrill Lynch Collateral, at least two of which (as indicated below) were included in the State Court TRO, and which ESMERIAN represented to Merrill Lynch to have the approximate

values listed below based on historical cost, to certain private buyers and/or jewelry dealers:

| Inventory Number | Description | Approximate Value |
|---|---|---|
| Endymion M13349 (in State Court TRO) | Platinum, lapis, diamond and carved agate flowers panel bracelet | $150,000 |
| Tango M12514 | Yellow Gold Ruby and Diamond Parrot's Head Brooch | $10,000 |
| Tango M11471 | Platinum Emerald & Diamond Ring | $6,500 |
| Endymion M13123 (in State Court TRO) | Platinum Black Enamel Carved Jade and Diamond Pendant Earrings | $20,000 |
| Total | | $186,500 |

20.  In or about March 2008, in violation of the Merrill Lynch Agreements, and without notice to Merrill Lynch, RALPH ESMERIAN, the defendant, sold the following items of Merrill Lynch Collateral, at least three of which (as indicated below) were included in the State Court TRO, and which ESMERIAN represented to Merrill Lynch to have the values listed below based on historical cost (except where otherwise indicated below), to a jewelry dealer who shared office space with ESMERIAN and with whom ESMERIAN had a decades-long business relationship ("Dealer-1"):

11

| Inventory Number | Description | Approximate Value |
|---|---|---|
| Foxtrot M11684 (in State Court TRO) | Silver top Yellow Gold Old Cut Diamond Feather Brooch, English, circa 1860 | $2,250,000 (based on appraisal commissioned by ESMERIAN) |
| Tango M12225A | 18K Yellow Gold Sapphire and Diamond Leaves Covered Watch by Van Cleef and Arpels | $11,000 |
| Tango M11836 | 18K Gold Invisibly Set Aquamarine, Ruby, Sapphire, Emerald, and Diamond Brooch and 2 Pairs of Earrings | $30,000 |
| Tango M12162 | 18K Yellow Gold Diamond and Sapphire Bracelet by Verger et Fils, circa 1945 | $35,000 |
| Tango M11220 | Seaman Schepps Brooch of Kwan Yang | $14,000 |
| Tango M11999 (in State Court TRO) | 18K Yellow Gold and Platinum White Enamel Brooch circa 1910. | $7,000 |
| Tango NA.3114 (in State Court TRO) | 18K Yellow Gold Enamel Poudrier with Amethyst | $4,500 |
| Tango M12225B | Van Cleef and Arpels sapphire and diamond brooch | $19,500 |
| Total | | $2,371,000 |

**The Fred Leighton Bankruptcy Proceedings and ESMERIAN's Ongoing Embezzlement and False Statements Under Oath**

21.  On or about April 15, 2008, RALPH ESMERIAN, the defendant, caused Fred Leighton and several other entities that he owned and controlled (hereinafter, the "Fred Leighton

Debtors"), to file a voluntary petition for relief under Title 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), in a matter captioned In re: Old Delaware Jewels, Inc., No. 08-11363 (RDD) (hereinafter, the "Bankruptcy Proceeding").

22.   In connection with the Bankruptcy Proceeding, on or about April 30, 2008 and thereafter, the Bankruptcy Court issued orders prohibiting, with certain limited exceptions, the transfer or sale of any of the Merrill Lynch Collateral or any other property of the Fred Leighton Debtors ("Debtor Property"), and the transfer of the proceeds of the sale of such property, to any third party without the prior written consent of Merrill Lynch or further order of the Bankruptcy Court (hereinafter, the "Bankruptcy Court Orders").  As set forth below, RALPH ESMERIAN, the defendant, repeatedly violated the Bankruptcy Court Orders by embezzling Debtor Property, selling it secretly, and retaining the proceeds of such sales for his personal use and other improper uses.

23.   In the course of the Bankruptcy Proceeding, RALPH ESMERIAN, the defendant, filed sworn affidavits (the "ESMERIAN Affidavits") and provided, on or about June 19 and August 4, 2009, sworn deposition testimony ("the ESMERIAN Deposition").  As set forth below, ESMERIAN repeatedly lied in the ESMERIAN

13

Affidavits and the ESMERIAN Deposition about the whereabouts and disposition of Debtor Property and other items.

### The 10-Carat Diamond Earrings

24.   Among the items of jewelry that RALPH ESMERIAN, the defendant, pledged as Merrill Lynch Collateral was a particular pair of earrings consisting of two 10-carat D-color flawless diamonds with inventory number Foxtrot NA.4817 (the "10-Carat Diamond Earrings"). At the time he pledged them to Merrill Lynch, ESMERIAN represented that the 10-Carat Diamond Earrings were worth approximately $5 million based on an expert appraisal that ESMERIAN commissioned in connection with the Merrill Lynch Loans.

25.   In or about August 2007, without notice to Merrill Lynch and in violation of the Merrill Lynch Agreements, RALPH ESMERIAN, the defendant, sold the 10-Carat Diamond Earrings for $1.4 million and, without informing Merrill Lynch of the sale, personally retained the proceeds of the sale. ESMERIAN sold the 10-Carat Diamond Earrings to Dealer-1 and another jewelry dealer ("Dealer-3"), who purchased one-third and two-thirds shares in the 10-Carat Diamond Earrings, respectively. ESMERIAN received the proceeds of this transaction as follows:

a.   A $933,333.33 wire transfer from Dealer-3 to ESMERIAN's personal bank account on or about August 21, 2007, and

b.   A $466,666.66 "contra" payment from Dealer-1 to REI on or about August 28, 2007, that is, a reduction in the debt that REI owed to Dealer-1 as a result of prior transactions between them.

26.   In an effort to conceal his embezzlement of the 10-Carat Diamond Earrings, RALPH ESMERIAN, the defendant, repeatedly lied during the ESMERIAN Deposition concerning the 10-Carat Diamond Earrings.   For example:

a.   On or about June 19, 2009, ESMERIAN falsely testified, in substance and in part, that (i) the 10-Carat Diamond Earrings were in the possession of a particular individual ("Individual-2"), who initially picked them up "in New York City . . . [i]n July 2008"; (ii) Individual-2 had agreed to purchase the 10-Carat Diamond Earrings for "$1,250,000"; and that (iii) "[i]t was going to be this week that a million two-fifty was going to be sent in.   I have not received it yet, but after several months of negotiation and talking in Europe, [Individual-2] came to a price with me on it, and said, 'I will send you the money.   It should be around the 15th.'   I am waiting for the money."

b.   On or about August 4, 2009, ESMERIAN falsely testified, in substance and in part, that the 10-Carat Diamond Earrings were "still with" Individual-2, who would be "coming to

New York in August, the end of August. . .[a]nd making a full payment" of "$1,250,000" for the Diamond Earrings.

### The Mauboussin Ruby Necklace

27.   Another item of jewelry that RALPH ESMERIAN, the defendant, pledged as Merrill Lynch Collateral is a particular Mauboussin ruby necklace with inventory number Tango M12573 (the "Mauboussin Ruby Necklace").   At the time he pledged it to Merrill Lynch, ESMERIAN represented that the Mauboussin Ruby Necklace was worth $650,000 based on historical cost.

28.   Because the Mauboussin Ruby Necklace was owned by one of the Fred Leighton Debtors, it became Debtor Property on or about April 15, 2008, when ESMERIAN caused the Fred Leighton Debtors to file a petition for relief in Bankruptcy Court.

29.   In or about late April 2008, in violation of the Bankruptcy Court Orders and the State Court TRO, and without notice to the Bankruptcy Court or Merrill Lynch, RALPH ESMERIAN, the defendant, sold the Mauboussin Ruby Necklace for $1 million to Dealer-1 and another jewelry dealer ("Dealer-2"), who each purchased a one-half share in the item.   ESMERIAN received at least $500,000 of the proceeds of this sale as follows:

a.   A $50,000 wire transfer from Dealer-1 to ESMERIAN's personal bank account on or about April 28, 2008;

b.   A $300,000 wire transfer from Dealer-1 to ESMERIAN's personal bank account on or about April 30, 2008; and

c.   A $150,000 check from Dealer-1 deposited into ESMERIAN's personal bank account on or about May 23, 2008.

30.   In an effort to conceal his embezzlement of the Mauboussin Ruby Necklace, RALPH ESMERIAN, the defendant, made false statements during the ESMERIAN Deposition concerning the Mauboussin Ruby Necklace.   For example, on or about June 19, 2009, ESMERIAN testified in substance and in part that, with respect to the Mauboussin Ruby Necklace, a representative of a particular London-based jeweler ("Dealer-4") "just picked it up from my office" in connection with a potential sale of such necklace.

## The Burma Ruby Ring

31.   Another item of jewelry that RALPH ESMERIAN, the defendant, pledged as Merrill Lynch Collateral is a particular 13-carat Burma ruby and diamond ring with inventory number Endymion MP3715R (the "Burma Ruby Ring").   At the time he pledged the Burma Ruby Ring to Merril Lynch, ESMERIAN represented that it was worth $2.94 million based on historical cost.

32.   Because the Burma Ruby Ring was owned by one of the Fred Leighton Debtors, it became Debtor Property on or about April 15, 2008, when ESMERIAN caused the Fred Leighton Debtors to file a petition for relief in Bankruptcy Court.

33.   In or about the summer of 2008, in violation of the Bankruptcy Court Orders, and without notice to the Bankruptcy

Court or Merrill Lynch, RALPH ESMERIAN, the defendant, sold the Burma Ruby Ring for $2 million to Dealer-1, which paid the entire $2 million by wire transfer to ESMERIAN's personal bank account on or about July 2, 2008.  By that time, Dealer-1, who continued to share office space with ESMERIAN, was the Chairman of the Unsecured Creditors' Committee in the Fred Leighton Bankruptcy Proceeding.

34.  In an effort to conceal his embezzlement of the Burma Ruby Ring, RALPH ESMERIAN, the defendant, testified falsely about the Burma Ruby Ring during the ESMERIAN Deposition. Specifically, on or about June 19, 2009, more than one year after he sold the Burma Ruby Ring to Dealer-1, ESMERIAN falsely testified that the Burma Ruby Ring was then located in a vault at REI's office in Manhattan, and that ESMERIAN "had an offer" that ESMERIAN "turned down yesterday" from a potential buyer to purchase the Burma Ruby Ring for "$2 million."

### The Endymion Butterfly Brooch

35.  Another item of jewelry that RALPH ESMERIAN, the defendant, pledged as Merrill Lynch Collateral is a particular butterfly brooch consisting of hundreds of virtually flawless canary and other colored diamonds with inventory number Endymion MP3487 (the "Endymion Butterfly Brooch").  At the time he pledged the Endymion Butterfly Brooch to Merrill Lynch, ESMERIAN

represented that the Endymion Butterfly Brooch was worth approximately $2.45 million based on historical cost.

36.  Because the Endymion Butterfly Brooch was owned by one of the Fred Leighton Debtors, it became Debtor Property on or about April 15, 2008, when ESMERIAN caused the Fred Leighton Debtors to file a petition for relief in Bankruptcy Court.

37.  On or about May 22, 2008, in violation of the Bankruptcy Court Orders, and without notice to the Bankruptcy Court or Merrill Lynch, ESMERIAN caused REI to sell the Endymion Butterfly Brooch, through an intermediary dealer ("Dealer-1"), to another jewelry dealer ("Dealer-2") for approximately $2.2 million.  ESMERIAN then caused approximately $1 million of the proceeds of this sale to be wired to his personal bank account in New York, New York in two installments of $500,000, whereupon ESMERIAN immediately wired one of these $500,000 installments to a bank account in Switzerland.

38.  On or about May 29, 2008, Dealer-2 sold the Endymion Butterfly Brooch to a group of investors ("Investor Group-2") for approximately $3 million.  In turn, Investor Group-2 consigned it to an international auction house for an auction of rare jewels in Hong Kong.

39.  In or about September 2008, Merrill Lynch discovered the pending auction of the Endymion Butterfly Brooch, and notified the auction house and other parties of its security

interest in the item.   The Bankruptcy Court subsequently required ESMERIAN to secure the return of the Endymion Butterfly Brooch.

**To Repurchase the Butterfly Brooch, ESMERIAN Steals More Jewelry**

40.   After the Bankruptcy Court ordered him to secure the return of the Endymion Butterfly Brooch, RALPH ESMERIAN, the defendant, learned that, because the Brooch had been sold to successive dealers after ESMERIAN's initial sale on or about May 22, 2008, ESMERIAN would have to pay $3.5 million to secure its return.   ESMERIAN raised that money, and subsequently secured the return of the Endymion Butterfly Brooch, by borrowing $800,000 from Dealer-1 on or about November 7, 2008, and selling, for $2.7 million, approximately 49 jewels and artifacts to a group of investors that included Accountant-1 and Business Advisor-1 ("Investor Group-2").   In connection with the sale of 49 items to Investor Group-2, ESMERIAN represented to Investor Group-2 that all 49 items were owned by REI free and clear of any encumberances.

41.   In truth and in fact, as RALPH ESMERIAN, the defendant, well knew, two items that ESMERIAN sold to Investor Group-2 belonged not to REI or ESMERIAN, but to a private collector and longtime customer of REI ("Individual-3").   These items, which Individual-3 had purchased from ESMERIAN on or about February 28, 2008 for the amounts listed below, were:

| Inventory No. | Description | Approximate Value |
|---|---|---|
| Calypso 42 | An Art Nouveau 'Salome' Brooch, with intertwined cobras, c.1904, by Lalique | $1,000,000 |
| Calypso 46 | An Art Nouveau 'Winter Landscape' Pendant, c. 1900, by Lalique | $1,000,000 |
| Total | | $2,000,000 |

ESMERIAN never informed Individual-3 that ESMERIAN had sold these items, and ESMERIAN did not remit any of the proceeds of the sale of the items to Individual-3.

42.   In addition, as RALPH ESMERIAN, the defendant, well knew, approximately 30 of the items that ESMERIAN sold to Investor Group-2 constituted Fred Leighton Debtor Property that ESMERIAN had pledged to Merrill Lynch at a total value of approximately $9.9 million.   ESMERIAN sold these items to Investor Group-2 in violation of the Bankruptcy Court Orders, and without notice to the Bankruptcy Court or Merrill Lynch.   In addition, ESMERIAN sold the items for a fraction of the value that ESMERIAN had represented to Merrill Lynch that the items were worth at the time of the Merrill Lynch Agreements.   The Debtor Property that ESMERIAN embezzled and sold to Investor Group-2 included the following, several of which (as indicated below) were listed in the State Court TRO, and which ESMERIAN had represented to Merrill Lynch to have the following values, based on historical cost, except where otherwise indicated below:

| Inventory No. | Description | Approximate Value |
|---|---|---|
| Calypso 2 | Duchess of Newcastle Diamond Brooch, circa 1887 | $1,500,000 (based on expert appraisal commissioned by ESMERIAN) |
| Calypso 24 | Engraved Diamond & Ruby Butterfly Brooch by Boucheron, circa 1894 | $2,500,000 (based on expert appraisal commissioned by ESMERIAN) |
| Endymion M11551R (in State Court TRO) | Antique Silver Emerald Bell and Diamond Pendant Earrings | $125,000 |
| Endymion M12874 (in State Court TRO) | Platinum Diamond Necklace | $105,000 |
| Endymion M13210 (in State Court TRO) | Platinum Baguette and Round Diamonds | $150,000 |
| Endymion M13223 (in State Court TRO) | Platinum Sapphire and Diamond Bracelet | $55,000 |
| Endymion M13389R | Platinum Diamond Pendant Necklace | $45,600 |
| Endymion M13489 (in State Court TRO) | Platinum Diamond Bracelet | $50,000 |
| Endymion MP3466 (in State Court TRO) | Platinum Cushion Shape Kashmir Sapphire and Diamond Earclips | $381,500 |

| | | |
|---|---|---|
| Endymion MP3523 | Platinum Green, Yellow, White Diamond Butterfly Brooch | $700,000 |
| Endymion MP57 (in State Court TRO) | Platinum Carved Emerald and Diamond Jungle Brooch | $175,000 |
| Tango M10922R2 (in State Court TRO) | Platinum Sapphire and Diamond Necklace/Brooch | $110,000 |
| Tango M12102 (in State Court TRO) | Platinum Onyx Bow Brooch with Onyx and Diamond Tassels, Cartier, circa 1910 | $111,000 |
| Tango M12671 (in State Court TRO) | Platinum Diamond Bracelet American, 1940's | $70,000 |
| Tango M12760 | Platinum Round Emerald and Diamond Brooch by Gattle | $50,000 |
| Tango M12936 | Platinum Diamond Spray Brooch, 1950s | $12,500 |
| Tango M13089R | Platinum Sugarloaf Cabochon Emerald and Diamond Pendant, 1910 | $50,000 |
| Tango MP3404R | 18K Yellow Gold Pink Diamond Brooch/Pink Diamond Skeleton Brooch (20 cts.) | $1,540,000 |
| Tango MP3690 (in State Court TRO) | Platinum Emerald and Diamond Bead Pendant Earrings | $315,000 |
| Tango MP3701 | Platinum Lozenge Shape Emerald and Diamond Ring | $105,000 |
| Tango MP3706 (in State Court TRO) | Emerald and Diamond Bead Necklace | $280,000 |
| Tango MP3741 (in State Court TRO) | Platinum Black Opal and Diamond Necklace | $175,000 |
| Tango MP3763 | Platinum Emerald and Diamond Ring | $182,700 |

23

| Tango MP3835 | Platinum Sapphire and Diamond Ring | $66,990 |
|---|---|---|
| Tango NA.3312 | Platinum Cabochon Emerald and Diamond Ring, 1970s | $100,000 |
| Tango NA.3314 (in State Court TRO) | Platinum Emerald and Diamond Cluster Pendant Earclips, 1968 | $125,000 |
| FL 11678 | Platinum Diamond Bracelet Circa 1930s | $22,313 |
| FL 211 | Platinum Diamond Round Brilliant and Baguette Line Necklace | $68,250 |
| FL 13230 | 18K Yellow Gold Diamond Briolette Pendant Earrings, Harry Winston | $360,000 |
| FL 13231 | 18K Yellow Gold Diamond and Canary Diamond Briolette Necklace, Harry Winston | $380,000 |
| Total | | $9,910,853 |

**Esmerian Repeatedly Lies Under Oath About
the Endymion Butterfly Brooch**

43.   In an effort to conceal his embezzlement of the Endymion Butterfly Brooch, RALPH ESMERIAN, the defendant, repeatedly lied under oath in the Fred Leighton Bankruptcy Proceedings about how the Endymion Butterfly Brooch came to be in the possession of an auction house in Hong Kong, and how it was subsequently recovered from that auction house.   ESMERIAN's false testimony included the following:

a.   In the ESMERIAN Affidavits, ESMERIAN falsely swore that:

i.   In March 2008, ESMERIAN consigned the Endymion Butterfly Brooch to Diamond Kanko, a Japanese dealer;

ii.   In May 2008, on behalf of Diamond Kanko, ESMERIAN received a $500,000 "security deposit" on the Endymion Butterfly Brooch (which ESMERIAN admitted was wired into ESMERIAN's personal bank account) from Dealer-2, Diamond Kanko's "business partner" and "agent";

iii.   Unbeknownst to ESMERIAN, Diamond Kanko and Dealer-2 subsequently consigned the Endymion Butterfly Brooch for auction in Hong Kong; and

iv.   Diamond Kanko and Dealer-2 refused to allow the Endymion Butterfly Brooch to be released to ESMERIAN unless ESMERIAN returned the $500,000 "security deposit" to Diamond Kanko.

b.   During the ESMERIAN Deposition, ESMERIAN falsely testified that:

i.   ESMERIAN actually owed significantly more than the $500,000 "security deposit" to Diamond Kanko because Diamond Kanko had previously paid certain of REI's debts, and in order to recover the Endymion Butterfly Brooch, ESMERIAN had to not only return the $500,000 "security deposit," but also satisfy such outstanding debts to Diamond Kanko;

ii.   ESMERIAN subsequently paid about $3 million to Dealer-2 to secure the return of the Endymion Butterfly

25

Brooch, of which $2 million was to repay REI's debt to Diamond Kanko.

### The JAR Butterfly Brooch

44.   Among the more valuable items that RALPH ESMERIAN, the defendant, pledged to Merrill Lynch in connection with the Merrill Lynch Loans in November 2005 and March 2006 was a particular Montana sapphire butterfly brooch by JAR, with inventory number Calypso 101 (the "JAR Butterfly Brooch"), which ESMERIAN represented to Merrill Lynch to have a value of $1,750,000 based on an expert appraisal that ESMERIAN commissioned in connection with the Merrill Lynch Loans.

45.   On or about February 28, 2008, RALPH ESMERIAN, the defendant, with notice to Merrill Lynch and the Bankruptcy Court, sold the JAR Butterfly Brooch to Individual-3 for $1.8 million, an amount equal to the appraised value that ESMERIAN represented the item to have at the time he pledged it to Merrill Lynch. When he received this money, ESMERIAN remitted it to Merrill Lynch.

46.   On or about October 16, 2008, Individual-3 consigned the JAR Butterfly Brooch to RALPH ESMERIAN, the defendant, for $1.8 million (that is, Individual-3 authorized ESMERIAN to sell the JAR Butterfly Brooch on Individual-3's behalf for $1.8 million).

47.   On or about November 28, 2008, through Fred
Leighton, RALPH ESMERIAN, the defendant, sold the JAR Butterfly
Brooch to a private buyer for approximately $1,890,000.   Under
the consignment agreement between ESMERIAN and Individual-3, this
sale triggered the sale of the JAR Butterfly Brooch from
Individual-3 to Fred Leighton for $1.8 million.

48.   On or about December 3, 2008, ESMERIAN gave
Individual-3 an invoice on the letterhead of Joshua-Jericho
Associates, LLC ("Joshua-Jericho"), a company owned and
controlled by Individual-3 that nominally owned, among other
things, the JAR Butterfly Brooch (hereinafter, "the Joshua-
Jericho Invoice").   The Joshua-Jericho Invoice reflected the sale
of the JAR Butterfly Brooch for $1.8 million by Joshua-Jericho to
Fred Leighton.   The Joshua-Jericho Invoice that ESMERIAN gave to
Individual-3 did not contain any payment instructions.

49.   On or about December 3, 2008, RALPH ESMERIAN, the
defendant, caused to be prepared, for use within Fred Leighton,
an alternate version of the Joshua Jericho Invoice ("the Forged
Joshua-Jericho Invoice").   The Forged Joshua-Jericho Invoice was
identical to the Joshua-Jericho Invoice except that the Forged
Joshua-Jericho Invoice contained purported payment instructions
from Joshua Jericho directing Fred Leighton to wire the $1.8
million proceeds of the sale of the JAR Butterfly Brooch to an
account held at J.P. Morgan Chase in the name of "Omnis

Industries" ("the Omnis Industries Account").  ESMERIAN did not
provide a copy of the Forged Joshua-Jericho Invoice to
Individual-3, or otherwise notify Individual-3 that Fred Leighton
intended to wire the $1.8 million which was owed to Individual-3
to the Omnis Industries Account.

      50.  On or about December 3, 2008, RALPH ESMERIAN, the
defendant, gave the Chief Financial Officer of Fred Leighton (the
"Fred Leighton CFO") a copy of the Forged Joshua-Jericho Invoice,
and falsely advised the Fred Leighton CFO that the seller of the
JAR Butterfly Brooch (Individual-3/Joshua Jericho) had requested
that the $1.8 million in proceeds from the sale be wired to the
Omnis Industries Account.  Based on that representation by
ESMERIAN, the Chairman and 100 percent owner of Fred Leighton,
and the instructions on the face of the Forged Joshua-Jericho
Invoice, the Fred Leighton CFO caused Fred Leighton to wire $1.8
million to the Omnis Industries Account.

      51.  In truth and in fact, and as RALPH ESMERIAN, the
defendant, well knew, Individual-3 never requested that Fred
Leighton wire the $1.8 million in proceeds from the sale of the
JAR Butterfly Brooch to the Omnis Industries Account.  In truth
and in fact, ESMERIAN had established Omnis Industries in or
about 1970 as a partnership that has been used primarily to hold
land in Lorain, Ohio, and, at all times relevant to this
Information, ESMERIAN controlled the Omnis Industries Account.

52.   On or about December 5, 2008, RALPH ESMERIAN, the defendant, caused $600,000 to be wired from the Omnis Industries Account to Joshua Jericho, Individual-3's company, in partial payment for the JAR Butterfly Brooch.  ESMERIAN kept the remaining $1.2 million proceeds from the sale of the JAR Butterfly Brooch for himself.  In particular, ESMERIAN transferred $300,000 of these funds to his personal bank account, transferred $100,000 to another creditor, and transferred $800,000 to Dealer-1 to repay the $800,000 loan that Dealer-1 had extended to ESMERIAN on or about November 7, 2008 to help ESMERIAN repurchase the Endymion Butterfly Brooch, as set forth above.

53.   On or about December 5, 2008, RALPH ESMERIAN, the defendant, and the Fred Leighton CFO met with representatives of Merrill Lynch.  During this meeting, the Merrill Lynch representatives asked why Fred Leighton had wired $1.8 million to Omnis Industries.  In response, ESMERIAN falsely stated, in substance and in part, that ESMERIAN did not know what Omnis Industries was.

54.   On or about December 8, 2008, the Fred Leighton CFO learned for the first time that, in fact, RALPH ESMERIAN, the defendant, controlled Omnis Industries, and that Omnis Industries was not associated in any way with Joshua Jericho, Individual-3's company.  Thereafter, ESMERIAN admitted to the Fred Leighton CFO,

29

in substance and in part, that he had concealed his association with Omnis Industries from the Fred Leighton CFO because ESMERIAN believed that the Fred Leighton CFO would not have approved the $1.8 million wire transfer to the Omnis Industries Account if ESMERIAN had told the CFO of ESMERIAN's association with Omnis Industries.

### Esmerian's Lies Under Oath About the JAR Butterfly Brooch

55. In an effort to conceal his embezzlement of the proceeds from the sale of the JAR Butterfly Brooch, RALPH ESMERIAN, the defendant, testified falsely about the JAR Butterfly Brooch during the ESMERIAN Deposition. Among other things:

a.   ESMERIAN falsely testified, in substance and in part, that, in or about December 2008, at the time Fred Leighton was ready to remit the $1.8 million proceeds of the sale of the JAR Butterfly Brooch to Individual-3, Individual-3 advised ESMERIAN that Individual-3 could not "'take the money yet'" because he had not "opened an account" for Joshua Jericho to receive the funds, and that it would take a couple of weeks to open such an account. In truth and in fact, and as ESMERIAN well knew, Individual-3 never made such purported statements to ESMERIAN.

b.   ESMERIAN also falsely testified that Individual-3 agreed, during this purported conversation, to

"loan" ESMERIAN part of the $1.8 million and that Individual-3 "had knowledge" that ESMERIAN "shifted the money into Omnis Industries."   In truth and in fact, and as ESMERIAN well knew, Individual-3 never agreed to loan any part of the proceeds of the sale of the JAR Butterfly Brooch to ESMERIAN, and Individual-3 had no knowledge of ESMERIAN's transfer of those proceeds to Omnis Industries.

### ESMERIAN Double-Pledges the Sarah Bernhardt Necklace and Other Merrill Lynch Collateral to Acorn

56.   On or about December 15, 2006 and December 17, 2007, in connection with a loan of approximately $40 million by Acorn to REI (the "Acorn Loan"), RALPH ESMERIAN, the defendant, pledged certain items of Merrill Lynch Collateral to Acorn.   In connection with the Acorn Loan, ESMERIAN represented and warranted to Acorn that ESMERIAN, REI and/or other ESMERIAN-related entities owned such items of jewelry free and clear of any and all liens or claims of others.   These items, which ESMERIAN represented to Merrill Lynch to have the values listed below based on historical cost, were as follows:

| Inventory No. | Description | Approximate Value |
|---|---|---|
| Tango M12706<br><br>(the "Sarah Bernhardt Necklace") | Lalique gold enamel necklace representing Sarah Bernhardt (Acorn Item No. 21). | $858,500 |
| Endymion MP3011<br><br>(the "Endymion Emerald and Diamond Necklace") | Emerald and diamond necklace (8 emeralds, 21.59 carats; 176 diamonds, 36 carats) (Acorn Item No. 57). | $630,000 |
| Tango NA.3663 | Gilded album commissioned by Marie-Antionette in 1781 (Acorn Item No. 37). | $1,500,000 |
| Tango NA.3661 | Collection of antique Islamic rings and gems (Acorn Item No. 11). | $1,500,000 |
| Tango M12623 | Carved ivory, enamel and jeweled case by Boucheron, commissioned by Tsar Nicholas II in 1893 (Acorn Item No. 38). | $148,549 |
| Endymion M13346 | Byzantine revival gold and enamel paper knife, circa 1860 (Acorn Item No. 58). | $204,000 |
| Tango NA.3665 | One lot of Greco-Roman gold jewelry (Acorn Item Nos. 2, 43, 44). | $1,500,000 |
| Total | | $6,341,049 |

57.   In or about 2009, in violation of the Bankruptcy Court Orders, and without notice to the Bankruptcy Court, Merrill Lynch, or Acorn, in an effort to conceal his unauthorized double-

pledging of collateral, RALPH ESMERIAN, the defendant, took the Sarah Bernhardt Necklace, which was at that time under the custody and control of Acorn, and placed it under the custody and control of Merrill Lynch.  At the same time, in "exchange" for the Sarah Bernhardt Necklace, ESMERIAN transferred to Acorn the following two additional items of Merrill Lynch Collateral: the Endymion Emerald and Diamond Necklace (which ESMERIAN had previously also pledged to Acorn, as set forth in the preceding paragraph) and a particular emerald, ruby, pearl and diamond necklace with inventory number Endymion MP3135 (the "Emerald Elephant Necklace," which Esmerian had previously represented to Merrill Lynch to have a value of $420,000 based on historical cost).

58.  During the ESMERIAN Deposition, RALPH ESMERIAN, the defendant, provided certain false testimony and made certain admissions concerning his secret and unauthorized transfer of the Sarah Bernhardt Necklace and other items of Merrill Lynch Collateral as set forth in the preceding paragraph.  Initially, among other things, ESMERIAN:

a.   admitted that, until recently, the Sarah Bernhardt Necklace had been in the possession of Acorn as collateral for the Acorn loan;

b.   testified that, after the commencement of the Fred Leighton Bankruptcy Proceedings, in order to regain

possession of the Sarah Bernhardt Necklace, which was an item of Merrill Lynch Collateral, ESMERIAN "traded" the Sarah Bernhardt Necklace with Acorn for certain other jewelry, including the Endymion Emerald and Diamond Necklace (the "Other Jewelry"); and

      c.   testified falsely that the Emerald Elephant Necklace was then located at REI's offices in Manhattan.

      59.  Subsequently, during the ESMERIAN Deposition, ESMERIAN admitted the following:

      a.   Contrary to his earlier testimony that the Emerald Elephant Necklace was then located at REI, the Emerald Elephant Necklace was, in fact, part of the Other Jewelry that ESMERIAN had given to Acorn in exchange for the Sarah Bernhardt Necklace;

      b.   Acorn had not, in fact, consented to ESMERIAN's "trade" of the Sarah Bernhardt Necklace for the Other Jewelry; and

      c.   Although ESMERIAN had "traded" the Sarah Bernhardt Necklace (an item of Merrill Lynch Collateral) for the Other Jewelry (including items of Merrill Lynch Collateral) after the Fred Leighton Bankruptcy Proceedings had commenced, ESMERIAN never informed either Merrill Lynch or Fred Leighton's Chief Restructuring Officer of such "trade."

**Additional Rare Jewelry Embezzled by ESMERIAN Post-Petition**

60.   Additional items of jewelry that RALPH ESMERIAN, the defendant, pledged as Merrill Lynch Collateral included the following (the "Additional Rare Jewelry"), which ESMERIAN represented to have the following values based on historical cost, except where otherwise specified below:

| Inventory No. | Description | Approximate Value |
|---|---|---|
| Foxtrot M13211 | Platinum Natural Kashmir sapphire and diamond ring | $2,500,000 (based on expert appraisal) |
| Endymion MP3558 | Platinum Cabochon Emerald and Diamond Cluster Earclips | $1,750,000 |
| Foxtrot NA.1681 | Emerald stone that was part of Foxtrot NA.1681 | $6,000,000 (expert appraisal of the entire item Foxtrot NA.1681) |
| Tango MP 3749/Endymion MP3777 (in State Court TRO) | 18 Carat Pink Gold and Pink Diamond Ring | $192,500 |
| Endymion MP 3472 | Emerald-cut emerald, gold and platinum ring | $700,000 |
| Total | | $11,142,500 (including value of entire item Foxtrot NA.1681) |

61.   Because the Additional Rare Jewelry was owned by certain of the Fred Leighton Debtors, it became Debtor property on or about April 15, 2008, when ESMERIAN caused the Fred

Leighton Debtors to file a petition for relief in Bankruptcy
Court.

62.   On various dates beginning in or about June 2008,
in violation of the Bankruptcy Court Orders and the State Court
TRO with respect to at least one item (as indicated above), and
without notice to the Bankruptcy Court or Merrill Lynch, RALPH
ESMERIAN, the defendant, embezzled and sold or otherwise
transferred the Additional Rare Jewelry.

### Statutory Allegations

63.   From on or about April 15, 2008, up to and
including on or about November 9, 2009, in the Southern District
of New York and elsewhere, RALPH ESMERIAN, the defendant,
unlawfully, willfully, and knowingly, having devised and
intending to devise a scheme and artifice to defraud and for the
purpose of executing and concealing such a scheme and artifice
and attempting to do so, did make a false and fraudulent
representation, claim, and promise concerning and in relation to
a proceeding under Title 11 of the United States Code, at a time
before and after the filing of a petition under Title 11, to wit,
ESMERIAN knowingly made numerous false statements concerning
various pieces of jewelry and rare artifacts such as, among other
things, the Endymion Butterfly Brooch, in sworn deposition
testimony, sworn affidavits, and other court filings in the Fred
Leighton Bankruptcy Proceeding, a Title 11 proceeding that

ESMERIAN brought in the United States Bankruptcy Court for the Southern District of New York for the discharge of the debts of the Fred Leighton Debtors, all as part of a scheme to defraud the Bankruptcy Court, Merrill Lynch, and other creditors by, among other things, concealing the location and disposition of Fred Leighton Debtor Property.

(Title 18, United States Code, Sections 157(3) and 2.)

## COUNT TWO
### (Concealment of Assets)

The United States Attorney further charges:

64. The factual allegations of paragraphs 1 through 62 are restated as if fully alleged herein.

65. From on or about April 15, 2008 up through and including on or about November 9, 2009, in the Southern District of New York and elsewhere, RALPH ESMERIAN, the defendant, unlawfully, knowingly, and fraudulently, did conceal from a custodian, trustee, marshal, and other officer of the court charged with the control and custody of property, and, in connection with a case under Title 11, from creditors and the United States Trustee, property belonging to the estate of a debtor, to wit, ESMERIAN embezzled, converted to his own use, and concealed the disposition of Fred Leighton Debtor Property worth at least $20 million, as set forth above.

(Title 18, United States Code, Sections 152(1) and 2.)

## COUNT THREE
### (Wire Fraud)

The United States Attorney further charges:

66.  The factual allegations of paragraphs 1 through 62 are restated as if fully alleged herein.

67.  From on or about November 5, 2005, up to and including on or about November 9, 2009, in the Southern District of New York and elsewhere, RALPH ESMERIAN, the defendant, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, ESMERIAN engaged in a scheme to defraud the Fred Leighton Debtors, Merrill Lynch, Acorn, and Individual-3, by, among other things, double-pledging collateral, embezzling and selling Debtor Property and the property of Individual-3, and transferring the proceeds of such sales for his own use and purposes by interstate and foreign wires, including a wire transfer of $500,000 from New York, New York to Switzerland on or about May 23, 2008.

(Title 18, United States Code, Sections 1343 and 2.)

38

## FORFEITURE ALLEGATION AS TO COUNT TWO

68.   As a result of committing the offense alleged in Count Two of this Information, RALPH ESMERIAN, the defendant, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, all property, real and personal, which constitutes or is derived from proceeds traceable to the offense alleged in Count Two, including but not limited to at least $20,000,000 in United States currency in that such amount, in the aggregate, constitutes or is derived from proceeds traceable to the offense alleged in Count Two of this Information.

### Substitute Asset Provision

69.   If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(1)   cannot be located upon the exercise of due diligence;

(2)   has been transferred or sold to, or deposited with, a third person;

(3)   has been placed beyond the jurisdiction of the Court;

(4)   has been substantially diminished in value; or

(5)   has been commingled with other property which cannot be subdivided without difficulty;

39

it is the intent of the United States, pursuant to 18 U.S.C. §
981, 21 U.S.C. § 853(p), and 28 U.S.C. § 2461, to seek forfeiture
of any other property of said defendant up to the value of the
above forfeitable property, including but not limited to the
forfeiture of all right, title and interest of the defendant in
the following property:

    a.    The real property and appurtenances known as 1001
Park Avenue, Apartment Number 12N, New York, New
York, including any and all right, title, and
interest in shares in the Cooperative Corporation
and any proprietary lease related to this
apartment.

    b.    The collection of paintings, photographs,
sculpture, decorative arts and manuscripts located
at 610 Fifth Avenue, Suite 414 New York, NY 10020
and at 1001 Park Avenue, Apartment Number 12N, New
York, NY 10028, as listed on the Form B6-Summary
of debtor Ralph Esmerian, filed in In re Ralph
Esmerian, Case No. 10-12721 (RDD), United States
Bankruptcy Court, Southern District of New York.

    c.    A one-third interest in Omnis Industries, a
partnership owning land in Lorain, Ohio.

    d.    $2,124.79 in United States currency in the account
number ending in 8079 held at JP Morgan Chase
Bank, 51 West 51st street, New York, NY 10019 in
the name of Ralph Esmerian.

    e.    The watch and cufflinks listed on the Form B6-
Summary of debtor Ralph Esmerian, filed in In re
Ralph Esmerian, Case No. 10-12721 (RDD), United
States Bankruptcy Court, Southern District of New
York.

    f.    The items and proceeds from the sale of such
items listed in paragraphs 14, 15, 16, 19, 20,
24, 25, 27, 29, 31, 33, 35, 37, 41, 42, 56, and
60 above.

g.   A 65 percent interest in R. Esmerian, Inc.

(Title 18, United States Code, Section 981,
Title 21, United States Code, Section 853, and
Title 28, United States Code, Section 2461.)

### FORFEITURE ALLEGATION AS TO COUNT THREE

70.   As a result of committing the offense alleged in Count Three of this Information, RALPH ESMERIAN, the defendant, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, all property, real and personal, which constitutes or is derived from proceeds traceable to the offense alleged in Count Three, and pursuant to 18 U.S.C. § 982(a)(2), any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of the offense alleged in Count Three, including but not limited to at least $20,000,000 in United States currency in that such amount, in the aggregate, constitutes or is derived from proceeds traceable to or obtained as a result of the offense alleged in Count Three of this Information.

### Substitute Asset Provision

71.   If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(1)   cannot be located upon the exercise of due diligence;

(2)   has been transferred or sold to, or deposited with, a third person;

41

(3)   has been placed beyond the jurisdiction of the Court;

(4)   has been substantially diminished in value; or

(5)   has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. §§ 981 and 982, 21 U.S.C. § 853(p), and 28 U.S.C. § 2461, to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property, including but not limited to the forfeiture of all right, title and interest of the defendant in the following property:

a.   The real property and appurtenances known as 1001 Park Avenue, Apartment Number 12N, New York, New York, including any and all right, title, and interest in shares in the Cooperative Corporation and any proprietary lease related to this apartment.

b.   The collection of paintings, photographs, sculpture, decorative arts and manuscripts located at 610 Fifth Avenue, Suite 414 New York, NY 10020 and at 1001 Park Avenue, Apartment Number 12N, New York, NY 10028, as listed on the Form B6-Summary of debtor Ralph Esmerian, filed in In re Ralph Esmerian, Case No. 10-12721 (RDD), United States Bankruptcy Court, Southern District of New York.

c.   A one-third interest in Omnis Industries, a partnership owning land in Lorain, Ohio.

d.   $2,124.79 in United States currency in the account number ending in 8079 held at JP Morgan Chase Bank, 51 West 51st street, New York, NY 10019 in the name of Ralph Esmerian.

e.  The watch and cufflinks listed on the Form B6-
    Summary of debtor Ralph Esmerian, filed in <u>In re
    Ralph Esmerian</u>, Case No. 10-12721 (RDD), United
    States Bankruptcy Court, Southern District of New
    York.

f.  The items and proceeds from the sale of such
    items listed in paragraphs 14, 15, 16, 19, 20,
    24, 25, 27, 29, 31, 33, 35, 37, 41, 42, 56, and
    60 above.

g.  A 65 percent interest in R. Esmerian, Inc.

(Title 18, United States Code, Sections 981 & 982,
 Title 21, United States Code, Section 853, and
 Title 28, United States Code, Section 2461.)


PREET BHARARA
United States Attorney

43

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

RALPH ESMERIAN,

Defendant.

INFORMATION

11 Cr.      (DLC)

(18 U.S.C. §§ 152, 157, 1343 & 2)

PREET BHARARA
United States Attorney.