UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
    :
UNITED STATES OF AMERICA    :
    :
    - v. -    :    11 Cr. 347 (DLC)
    :
RALPH ESMERIAN,    :
    :
    Defendant.    :
    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## SENTENCING MEMORANDUM

                                PREET BHARARA
                                United States Attorney
                                for the Southern District of New York
                                Attorney for the United States of America

DAVID B. MASSEY
NICOLE W. FRIEDLANDER
Assistant United States Attorneys,
    Of Counsel.

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*

*One Saint Andrew's Plaza*
*New York, New York  10007*

July 20, 2011

<u>By ECF and By Hand</u>
The Honorable Denise L. Cote
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

   Re: <u>United States</u> v. <u>Ralph Esmerian</u>, 11 Cr. 347 (DLC)

Dear Judge Cote:

  The Government respectfully submits this letter in preparation for the sentencing of the defendant Ralph Esmerian ("Esmerian" or "the defendant"), scheduled for July 22, 2011, and in response to Esmerian's sentencing memorandum dated July 13, 2011 (hereinafter, "Esmerian Mem."). The Government respectfully requests that the Court sentence Esmerian, a wholesale dealer in museum-quality jewelry and rare artifacts, to a Guidelines sentence of 97 to 121 months' imprisonment.

  The primary basis for such a sentence is the seriousness of Esmerian's conduct, which began at the time he borrowed approximately $177 million in total from Merrill Lynch for the purpose of financing his wholesale jewelry business R. Esmerian, Inc. ("REI") and purchasing Fred Leighton LLC, a high-end jewelry retailer, and related entities (together with Fred Leighton Holdings, Inc., "Fred Leighton"). As described in further detail below, numerous pieces of valuable collateral that Esmerian pledged to Merrill Lynch had already been sold.

  Then, beginning in June 2006 and thereafter, without notice to Merrill Lynch, Esmerian sold and double-pledged collateral previously pledged to Merrill Lynch to third parties for the purpose of, among other things, obtaining other loans, including a $40 million loan from the hedge fund Acorn Capital Group. After Esmerian caused Fred Leighton and several related entities to file for bankruptcy protection in April 2008, Esmerian repeatedly embezzled property belonging to Fred Leighton and other debtor entities, sold it, and stole the proceeds.

  For instance, as described in more detail below, in May 2008, Esmerian secretly sold a $2.45 million item of debtor property (and Merrill Lynch collateral) known as the "Endymion

Butterfly Brooch," and diverted the proceeds to his own use.  After Merrill Lynch discovered this theft, Esmerian quickly raised the funds required to secure the return of the Endymion Butterfly Brooch by stealing additional debtor property valued at approximately $9.9 million and selling it at a fraction of that value.  When this and other conduct was discovered through investigations by his creditors and others, beginning in at least December 2008 and extending through November 2010, Esmerian concealed his conduct through false affidavits, false testimony, false statements in open Court to United States Bankruptcy Judge Robert Drain, and by fabricating documents.

As the United States Trustee for the Southern District of New York wrote to the Court in connection with this case, "Esmerian subverted the bankruptcy system by lying repeatedly to the Court, his creditors and this Office and by embarking in an elaborate scheme to conceal assets." *See* Letter to the Honorable Denise L. Cote from Serene Nakano, Trial Attorney, Office of the United States Trustee for the Southern District of New York, July 8, 2011 ("United States Trustee Letter to the Court") at 2-3.

For this and other reasons described below, the Government believes a Guidelines sentence is sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

## I.   BACKGROUND

A.   <u>The Information and Esmerian's Guilty Plea</u>

On April 15, 2011, the Government filed an Information charging Esmerian in three counts.  Count One charged the defendant with bankruptcy fraud, in violation of 18 U.S.C. §§ 157(3) and 2.  Count Two charged the defendant with concealment of assets belonging to the estate of a debtor, in violation of 18 U.S.C. §§ 152(1) and 2.  Count Three charged the defendant with wire fraud, in violation of 18 U.S.C. §§ 1343 and 2.

On April 15, 2011, Esmerian pled guilty to all three counts of the Information.  His plea agreement dated April 1, 2011 contains the following stipulations:

- Counts One through Three are grouped pursuant to U.S.S.G. § 3D1.2(d).

- Because Count Three has a statutory maximum term of imprisonment of 20 years or more, the base offense level is 7, pursuant to U.S.S.G. § 2B1.1(a)(1).

- Because the loss resulting from the conduct charged in Counts One through Three of the Information was more than $20,000,000, but not more than $50,000,000, the offense level is increased by 22 levels, pursuant to U.S.S.G. § 2B1.1(b)(1)(L).

- Because the offense charged in Counts One through Three involved sophisticated means, the offense level is increased by two levels, pursuant to U.S.S.G. § 2B1.1(b)(9)(C).

- Because the offense involved a misrepresentation or other fraudulent action during the course of a bankruptcy proceeding, the offense level is increased by two levels, pursuant to U.S.S.G. § 2B1.1(b)(8)(B).

- With three points' credit for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1, Esmerian's total offense level is 30.

- Based on a Criminal History Category of I, Esmerian's stipulated Guidelines range is 97 to 121 months' imprisonment (the "Stipulated Guidelines Range").

- While the parties agreed that "neither a downward nor an upward departure from the Stipulated Guidelines Range set forth above is warranted," the parties further agreed that "either party may seek a sentence outside of the Stipulated Guidelines" based on the factors of Title 18, United States Code, Section 3553(a).

In its Presentencing Investigation Report dated July 15, 2011 ("PSR"), the Probation Department reached the same Guidelines range. PSR ¶ 69-82, 114. The Probation Department recommended a non-Guidelines sentence of 72 months' imprisonment based on "the defendant's age, the loss of his family business, personal bankruptcy (including the loss of his home), and in light of his charitable works (outlined in counsel's sentencing memorandum), and lack of any prior criminal record[.]" PSR at 42 (Sentencing Recommendation).

## II. ESMERIAN'S CRIMINAL CONDUCT

A.   <u>The Merrill Lynch Loans</u>

This case arose from Esmerian's conduct in connection with $177 million in loans that he obtained from Merrill Lynch in 2005 and 2006 for the purpose of, among other things, purchasing Fred Leighton as a retail outlet for REI's valuable inventory ("the Merrill Lynch Loans"). The Merrill Lynch Loans were secured by, among other things, the inventory of Fred Leighton and valuable collections of jewelry, antiques, and artifacts that Esmerian represented that he owned free and clear of any liens or encumbrances, and which he pledged to Merrill Lynch through agreements (the "Merrill Lynch Agreements") that specified each individual item of collateral (together with additional collateral that Esmerian pledged in April 2007 and thereafter, the "Merrill Lynch Collateral"). Among other things, the Merrill Lynch Agreements prohibited Esmerian from pledging the Merrill Lynch Collateral to third parties without notice to Merrill Lynch, and placed restrictions on Esmerian's ability to sell or transfer the Merrill Lynch Collateral.

Unbeknownst to Merrill Lynch, at the time Esmerian entered into the Merrill Lynch Agreements in March 2006, Esmerian had already sold and retained the proceeds of, or pledged to third parties, more than thirty items of Merrill Lynch Collateral. PSR ¶ 20. Esmerian represented to Merrill Lynch that these items were worth approximately $3.5 million. PSR ¶ 20.

Three months later, in June 2006, unbeknownst to Merrill Lynch, Esmerian caused REI to sell 38 particular items of jewelry and other objects to Jeweled Objects LLC (the "Jeweled Objects Transaction"), a company owned, in part, and controlled by Accountant-1 and Business Advisor-1, both of whom who had advised Esmerian in connection with the Merrill Lynch loans. In connection with the Jeweled Objects Transaction, Esmerian represented to Jeweled Objects that REI owned all such 38 items free and clear of any liens, encumbrances, and other restrictions (the "Jeweled Objects Representations"). In fact, in violation of the Merrill Lynch Agreements and the Jeweled Objects Representations, six of the 38 items that Esmerian sold to Jeweled Objects were Merrill Lynch Collateral, which Esmerian had represented to Merrill Lynch to be worth $1.6 million based on historical cost to REI. PSR ¶ 21.

In addition, among the other 32 objects that REI sold as part of the Jeweled Objects Transaction was a 9.77 Carat Emerald Ring (hereinafter "the Jeweled Objects Emerald Ring"). On February 26, 2008, Jeweled Objects consigned the Jeweled Objects Emerald Ring to Esmerian so that he could, acting as Jeweled Objects's agent, sell it to a third party. On May 28, 2009, Esmerian advised Accountant-1 that he had sold the Jeweled Objects Emerald Ring to a private individual (hereinafter, "Individual-1") for $250,000, and that Esmerian would remit the $250,000 to Jeweled Objects. Esmerian gave Accountant-1 a handwritten invoice purporting to show the sale of the Jeweled Objects Emerald Ring to Individual-1. This document was a forgery. In fact, Esmerian never remitted to Jeweled Objects any of the proceeds of the sale of the Jeweled Objects Emerald Ring, and Individual-1 never bought or even considered buying the Jeweled Objects Emerald Ring. PSR ¶ 22-26.

B.   The State Court TRO

Following Esmerian's default on the Merrill Lynch Loans in September 2007, Merrill Lynch brought a civil action against Esmerian and entities that he controlled. On January 8, 2008, the New York State Supreme Court issued a temporary restraining order (the "State Court TRO") prohibiting Esmerian and REI from selling or transferring certain specified items of Merrill Lynch Collateral without depositing the proceeds in bank accounts owned by the debtor entities. In February and March 2008, Esmerian repeatedly violated the State Court TRO and the Merrill Lynch Loan Agreements by secretly selling at least two items of Merrill Lynch Collateral worth approximately $170,000 (based on historical cost to REI) and retaining the proceeds. PSR ¶ 27-28. In addition, in March 2008, Esmerian sold an item of Merrill Lynch Collateral (a Silver Top Diamond Feather Brooch) subject to the TRO that he had represented to Merrill Lynch was worth $2.25 million (based on an appraisal that Esmerian commissioned), as well as seven other pieces of Merrill Lynch Collateral, to a jewelry dealer with whom he shared office space and had a decades-long business relationship ("Dealer-1"). PSR ¶ 29.

C.   The Fred Leighton Bankruptcy Proceedings and
     Esmerian's Ongoing Embezzlement and False Statements Under Oath

On April 15, 2008, Esmerian caused Fred Leighton and several other entities that he owned and controlled (hereinafter, the "Fred Leighton Debtors"), to file a voluntary petition for relief under Title 11 of the United States Bankruptcy Code in the United States Bankruptcy

5

Court for the Southern District of New York (the "Bankruptcy Court"), in a matter captioned <u>In re: Old Delaware Jewels, Inc.</u>, No. 08-11363 (RDD) (hereinafter, the "Fred Leighton Bankruptcy Proceeding").

In connection with the Bankruptcy Proceeding, on April 30, 2008 and thereafter, the Bankruptcy Court issued orders prohibiting, with certain limited exceptions, the transfer or sale of any of the Merrill Lynch Collateral or any other property of the Fred Leighton Debtors ("Debtor Property"), and the transfer of the proceeds of the sale of such property, to any third party without the prior written consent of Merrill Lynch or further order of the Bankruptcy Court (hereinafter, the "Bankruptcy Court Orders"). As set forth below, Esmerian repeatedly violated the Bankruptcy Court Orders by embezzling Debtor Property, selling it secretly, and retaining the proceeds of such sales for his personal use and other improper uses.

In the course of the Fred Leighton Bankruptcy Proceeding, Esmerian filed sworn affidavits on December 8, 2008, January 17, 2009, and February 5, 2009 (the "Esmerian Affidavits") and provided, on June 19 and August 4, 2009, sworn deposition testimony ("the Esmerian Deposition"). As set forth below, Esmerian repeatedly lied in the Esmerian Affidavits and the Esmerian Deposition about the whereabouts and disposition of Debtor Property and other items.

      1.      <u>The Endymion Butterfly Brooch</u>

The most egregious episode of Esmerian's lies and embezzlement arose in connection his pledge to Merrill Lynch of the Endymion Butterfly Brooch – $2.45 million butterfly brooch consisting of hundreds of virtually flawless canary and other colored diamonds with inventory number Endymion MP3487. Because the Endymion Butterfly Brooch was owned by one of the Fred Leighton Debtors, it became Debtor Property on April 15, 2008, when Esmerian caused the Fred Leighton Debtors to file a petition for relief in Bankruptcy Court.

On May 22, 2008, in violation of the Bankruptcy Court Orders, and without notice to the Bankruptcy Court or Merrill Lynch, Esmerian caused REI to sell the Endymion Butterfly Brooch, through an intermediary dealer ("Dealer-1"), to another jewelry dealer ("Dealer-2") for approximately $2.2 million. Esmerian then caused approximately $1 million of the proceeds of this sale to be wired to his personal bank account in New York, New York in two installments of $500,000, whereupon Esmerian immediately wired one of these $500,000 installments to a bank account in Switzerland. On May 29, 2008, Dealer-2 sold the Endymion Butterfly Brooch to a group of investors ("Investor Group-1") for approximately $3 million. In turn, Investor Group-1 consigned it to an international auction house for an auction of rare jewels in Hong Kong.

In September 2008, Merrill Lynch discovered the pending auction of the Endymion Butterfly Brooch, and notified the auction house and other parties of its security interest in the item. The Bankruptcy Court subsequently required Esmerian to secure the return of the Endymion Butterfly Brooch.

Having been caught stealing this valuable item, Esmerian did not admit what he had done or raise the funds to secure the return of the Brooch through legitimate means. Instead, stole more Merrill Lynch Collateral. Because the Brooch had been sold to successive dealers after Esmerian's initial sale on May 22, 2008, Esmerian would have to pay $3.5 million to secure its return. Esmerian raised most of that money by selling, for $2.7 million, approximately 49 jewels and artifacts to a group of investors that included Accountant-1 and Business Advisor-1 ("Investor Group-2"), and by borrowing $800,000 from Dealer-1. At that time, Esmerian represented to Investor Group-2 that all 49 items were owned by REI free and clear of any encumberances. In fact, of these 49 items, at least 32 of them were not Esmerian's to sell.

For example, two items that Esmerian sold to Investor Group-2 belonged not to REI or Esmerian, but to a private collector and longtime customer of REI ("Individual-3"). The items were an Art Nouveau 'Salome' Brooch, with intertwined cobras, c.1904, by Lalique (Calpyso 42) and an Art Nouveau 'Winter Landscape' Pendant, c. 1900, by Lalique (Calpyso 46). Individual-3 had purchased these two items from Esmerian for $1 million each in February 2008 under the name Joshua-Jericho Associates. Esmerian sold these two items to Investor Group-2 for $160,000 each – far below the $1 million price at which Esmerian had sold them to Individual-3 earlier that year. Counsel for Individual-3 submitted a Victim Impact Statement to the Court describing his client's $2 million loss from this event. *See* Letter from Gary Stein (Counsel for Joshua-Jericho Associates et al.) to Wendy Olsen, July 15, 2011 ("Joshua-Jericho Letter to the Court") (describing a total loss of $3.2 million).

In addition, as Esmerian knew, approximately 30 of the items that Esmerian sold to Investor Group-2 constituted Fred Leighton Debtor Property that Esmerian had pledged to Merrill Lynch at a total value of approximately $9.9 million. Esmerian sold these items to Investor Group-2 in violation of the Bankruptcy Court Orders, and without notice to the Bankruptcy Court or Merrill Lynch. Esmerian sold the items for a fraction of the value that Esmerian had represented to Merrill Lynch that the items were worth at the time of the Merrill Lynch Agreements.

After Esmerian secured the return of the Endymion Butterfly Brooch, he compounded his offense by telling a series of elaborate lies in the course of the Fred Leighton Bankruptcy Proceeding through sworn affidavits to the Bankruptcy Court, in sworn deposition testimony, and in open court to United States Bankruptcy Judge Robert Drain.

Specifically, Esmerian lied about how the Endymion Butterfly Brooch came to be in the possession of an auction house in Hong Kong, and how it was subsequently recovered from that auction house. For example, in the Esmerian Affidavits, Esmerian falsely swore that:

- In March 2008, Esmerian consigned the Endymion Butterfly Brooch to Diamond Kanko, a Japanese dealer;

- In May 2008, on behalf of Diamond Kanko, Esmerian received a $500,000 security deposit on the Endymion Butterfly Brooch from Dealer-2, which was acting as Diamond Kanko's agent;

- Unbeknownst to Esmerian, Diamond Kanko and Dealer-2 subsequently consigned the Endymion Butterfly Brooch for auction in Hong Kong; and

- Diamond Kanko and Dealer-2 refused to allow the Endymion Butterfly Brooch to be released to Esmerian unless Esmerian returned the $500,000 "security deposit" to Diamond Kanko.

When asked in open court by Judge Drain about these matters on March 4, 2009, Esmerian lied directly to the Court, as follows:

> THE COURT: . . . . Mr. Esmerian, you stand by your affidavit that [Dealer-2] was Diamond K[a]nko's agent on this matter?
>
> MR. ESMERIAN: Yes, Your Honor. They had advanced the original check of $500,000 that I had asked from Diamond K[a]nko[,] and Diamond K[a]nko had said that it would come from [Dealer-2]. And it is to them that the check was repaid.

*See* Transcript of Hearing Before the Honorable Robert D. Drain, United States Bankruptcy Judge, In re: Fred Leighton Holding, Inc., et al., Case No. 08-11363 (RDD), March 4, 2009, at 7-8

During the Esmerian Deposition in June and August 2009, Esmerian further testified falsely that:

- Esmerian actually owed significantly more than the $500,000 "security deposit" to Diamond Kanko because Diamond Kanko had previously paid certain of REI's debts, and in order to recover the Endymion Butterfly Brooch, Esmerian had to not only return the $500,000 "security deposit," but also satisfy such outstanding debts to Diamond Kanko;

- Esmerian subsequently paid about $3 million to Dealer-2 to secure the return of the Endymion Butterfly Brooch, of which $2 million was to repay REI's debt to Diamond Kanko.

All of these statements were lies that came to light through a costly and needless investigation conducted by Merrill Lynch's counsel in the Fred Leighton Bankruptcy Proceeding. Merrill Lynch has submitted a Victim Impact Statement addressing this issue, among others, and stating that its losses from Esmerian's fraud were in the tens of millions of dollars. *See* Letter from Howard Hawkins (Counsel for Merrill Lynch) to the Honorable Denise Cote, July 13, 2011 ("Merrill Lynch Letter to the Court"), at 3.

## 2. The JAR Butterfly Brooch

Esmerian also lied under oath to cover up his theft of $1.2 million that he raised from the sale of another valuable item: a particular Montana sapphire butterfly brooch by JAR, with inventory number Calypso 101 (the "JAR Butterfly Brooch"), which Esmerian represented to Merrill Lynch to have a value of $1,750,000 based on an expert appraisal that Esmerian commissioned in connection with the Merrill Lynch Loans.

On February 28, 2008, Esmerian, with notice to Merrill Lynch and the Bankruptcy Court, sold the JAR Butterfly Brooch to Individual-3 (again, using the entity Joshua-Jericho Associates) for $1.8 million, an amount equal to the appraised value that Esmerian represented the item to have at the time he pledged it to Merrill Lynch. When he received this money, Esmerian properly remitted it to Merrill Lynch.

On October 16, 2008, Individual-3 consigned the JAR Butterfly Brooch to Esmerian for $1.8 million (that is, Individual-3 authorized Esmerian to sell the JAR Butterfly Brooch on Individual-3's behalf for $1.8 million).

On November 28, 2008, through Fred Leighton, Esmerian sold the JAR Butterfly Brooch to a private buyer for approximately $1,890,000. Under the consignment agreement between Esmerian and Individual-3, this sale triggered the sale of the JAR Butterfly Brooch from Individual-3 to Fred Leighton for $1.8 million.

On December 3, 2008, Esmerian gave Individual-3 an invoice on the letterhead of Joshua-Jericho Associates, LLC ("Joshua-Jericho"), a company owned and controlled by Individual-3 that nominally owned, among other things, the JAR Butterfly Brooch (hereinafter, "the Joshua-Jericho Invoice"). The Joshua-Jericho Invoice reflected the sale of the JAR Butterfly Brooch for $1.8 million by Joshua-Jericho to Fred Leighton. The Joshua-Jericho Invoice that Esmerian gave to Individual-3 did not contain any payment instructions. Esmerian provided this invoice purportedly as a courtesy to Individual-3, who did not otherwise conduct business that would require Joshua-Jericho Associates to issue an invoice.

On December 3, 2008, Esmerian caused to be prepared, for use within Fred Leighton, an alternate version of the Joshua Jericho Invoice ("the Forged Joshua-Jericho Invoice"). The Forged Joshua-Jericho Invoice was identical to the Joshua-Jericho Invoice except that the Forged Joshua-Jericho Invoice contained purported payment instructions from Joshua Jericho directing Fred Leighton to wire the $1.8 million proceeds of the sale of the JAR Butterfly Brooch to an account held at J.P. Morgan Chase in the name of "Omnis Industries" ("the Omnis Industries Account"). Esmerian did not provide a copy of the Forged Joshua-Jericho Invoice to Individual-3, or otherwise notify Individual-3 that Fred Leighton intended to wire the $1.8 million which was owed to Individual-3 to the Omnis Industries Account.

On December 3, 2008, Esmerian gave the Chief Financial Officer of Fred Leighton (the "Fred Leighton CFO") a copy of the Forged Joshua-Jericho Invoice, and falsely advised the Fred Leighton CFO that the seller of the JAR Butterfly Brooch (Individual-3/Joshua Jericho) had

Case 1:11-cr-00347-DLC   Document 21   Filed 07/20/11   Page 10 of 19

requested that the $1.8 million in proceeds from the sale be wired to the Omnis Industries Account. Based on that representation by Esmerian, the Chairman and 100 percent owner of Fred Leighton, and the instructions on the face of the Forged Joshua-Jericho Invoice, the Fred Leighton CFO caused Fred Leighton to wire $1.8 million to the Omnis Industries Account.

In fact, as Esmerian knew, Individual-3 never requested that Fred Leighton wire the $1.8 million in proceeds from the sale of the JAR Butterfly Brooch to the Omnis Industries Account. Esmerian controlled the Omnis Industries Account; he had established Omnis Industries in 1970 as a partnership that has been used primarily to hold land in Ohio.

On December 5, 2008, Esmerian caused $600,000 to be wired from the Omnis Industries Account to Joshua Jericho, Individual-3's company, in partial payment for the JAR Butterfly Brooch. Esmerian kept the remaining $1.2 million proceeds from the sale of the JAR Butterfly Brooch for himself. In particular, Esmerian transferred $300,000 of these funds to his personal bank account, transferred $100,000 to another creditor, and transferred $800,000 to Dealer-1 to repay the $800,000 loan that Dealer-1 had extended to Esmerian in November 2008 to help Esmerian repurchase the Endymion Butterfly Brooch, as set forth above.

On December 5, 2008, Esmerian and the Fred Leighton CFO met with representatives of Merrill Lynch. During this meeting, the Merrill Lynch representatives asked why Fred Leighton had wired $1.8 million to Omnis Industries. In response, Esmerian falsely stated that Esmerian did not know what Omnis Industries was.

On December 8, 2008, the Fred Leighton CFO learned for the first time that, in fact, Esmerian controlled Omnis Industries, and that Omnis Industries was not associated in any way with Joshua Jericho, Individual-3's company. Thereafter, Esmerian admitted to the Fred Leighton CFO that he had concealed his association with Omnis Industries from the Fred Leighton CFO because Esmerian believed that the Fred Leighton CFO would not have approved the $1.8 million wire transfer to the Omnis Industries Account if Esmerian had told the CFO of Esmerian's association with Omnis Industries.

In an effort to conceal his embezzlement of the proceeds from the sale of the JAR Butterfly Brooch, Esmerian testified falsely about the JAR Butterfly Brooch during the Esmerian Deposition, as follows:

- Esmerian falsely testified that, in December 2008, at the time Fred Leighton was ready to remit the $1.8 million proceeds of the sale of the JAR Butterfly Brooch to Individual-3, Individual-3 advised Esmerian that Individual-3 could not "'take the money yet'" because he had not "opened an account" for Joshua Jericho to receive the funds, and that it would take a couple of weeks to open such an account. In fact, as Esmerian knew, Individual-3 never made these statements to Esmerian.

10

- Esmerian also falsely testified that Individual-3 agreed, during this purported conversation, to "loan" Esmerian part of the $1.8 million and that Individual-3 "had knowledge" that Esmerian "shifted the money into Omnis Industries." In fact, as Esmerian knew, Individual-3 never agreed to loan any part of the proceeds of the sale of the JAR Butterfly Brooch to Esmerian, and Individual-3 had no knowledge of Esmerian's transfer of those proceeds to Omnis Industries.

Individual-3 and the company through which Individual-3 operated for purposes of these transactions, Joshua-Jericho Associates, suffered a $1.2 million loss as a result of these events. Counsel for Individual-3 submitted a Victim Impact Statement to the Court describing his client's $2 million loss from this event. *See* Joshua-Jericho Letter to the Court.

### 3.  The 10-Carat Diamond Earrings

Among the highest-value items of jewelry that Esmerian pledged as Merrill Lynch Collateral was a pair of earrings consisting of two 10-carat D-color flawless diamonds with inventory number Foxtrot NA.4817 (the "10-Carat Diamond Earrings"). At the time he pledged them to Merrill Lynch, Esmerian represented that the 10-Carat Diamond Earrings were worth approximately $5 million based on an expert appraisal that Esmerian commissioned in connection with the Merrill Lynch Loans.

In approximately August 2007, without notice to Merrill Lynch and in violation of the Merrill Lynch Agreements, Esmerian sold the 10-Carat Diamond Earrings for $1.4 million – a fraction of the price at which they had been appraised for Esmerian – and, without informing Merrill Lynch of the sale, Esmerian personally retained the proceeds of the sale. Esmerian sold the 10-Carat Diamond Earrings to Dealer-1 and another jewelry dealer ("Dealer-3"), who purchased one-third and two-thirds shares in the 10-Carat Diamond Earrings, respectively. Esmerian received the proceeds of this transaction via a $933,333.33 wire transfer from Dealer-3 to Esmerian's personal bank account on August 21, 2007, and a $466,666.66 "contra" payment from Dealer-1 to REI on August 28, 2007 (that is, a reduction in the debt that REI owed to Dealer-1 as a result of prior transactions between them).

In an effort to conceal his embezzlement of the 10-Carat Diamond Earrings, Esmerian repeatedly lied about them during the Esmerian Deposition. For example, on June 19, 2009, Esmerian falsely testified, among other things, that (a) the 10-Carat Diamond Earrings were in the possession of a particular individual ("Individual-2"), who initially picked them up "in New York City . . . [i]n July 2008"; (b) Individual-2 had agreed to purchase the 10-Carat Diamond Earrings for "$1,250,000"; and that (c) "[i]t was going to be this week that a million two-fifty was going to be sent in. I have not received it yet, but after several months of negotiation and talking in Europe, [Individual-2] came to a price with me on it, and said, 'I will send you the money. It should be around the 15th.' I am waiting for the money."

Esmerian continued lying about the whereabouts of the 10-Carat Diamond Earrings when he testified again during the Esmerian Deposition on August 4, 2009. At that time, Esmerian falsely testified, among other things, that the 10-Carat Diamond Earrings were "still with"

Individual-2, who would be "coming to New York in August, the end of August. . .[a]nd making a full payment" of "$1,250,000" for the Diamond Earrings.

    4.    <u>The Mauboussin Ruby Necklace</u>

Another item of high-value jewelry that Esmerian pledged as Merrill Lynch Collateral is a particular Mauboussin ruby necklace with inventory number Tango M12573 (the "Mauboussin Ruby Necklace"). At the time he pledged it to Merrill Lynch, Esmerian represented that the Mauboussin Ruby Necklace was worth $650,000 based on historical cost. Because the Mauboussin Ruby Necklace was owned by one of the Fred Leighton Debtors, it became Debtor Property on April 15, 2008, when Esmerian caused the Fred Leighton Debtors to file a petition for relief in Bankruptcy Court.

In late April 2008, in violation of the Bankruptcy Court Orders and the State Court TRO, and without notice to the Bankruptcy Court or Merrill Lynch, Esmerian sold the Mauboussin Ruby Necklace for $1 million to Dealer-1 and another jewelry dealer ("Dealer-2"), who each purchased a one-half share in the item. Esmerian received at least $500,000 of the proceeds of this sale via (a) a $50,000 wire transfer from Dealer-1 to Esmerian's personal bank account on April 28, 2008; (b) a $300,000 wire transfer from Dealer-1 to Esmerian's personal bank account on April 30, 2008; and (c) a $150,000 check from Dealer-1 deposited into Esmerian's personal bank account on May 23, 2008.

In an effort to conceal his embezzlement of the Mauboussin Ruby Necklace, Esmerian made false statements during the Esmerian Deposition concerning the Mauboussin Ruby Necklace. For example, on June 19, 2009, Esmerian falsely testified, with respect to the Mauboussin Ruby Necklace, that a representative of a particular London-based jeweler ("Dealer-4") "just picked it up from my office" in connection with a potential sale of such necklace.

    5.    <u>The Burma Ruby Ring</u>

Also among the highest-value items of jewelry Esmerian pledged as Merrill Lynch Collateral was a particular 13-carat Burma ruby and diamond ring with inventory number Endymion MP3715R (the "Burma Ruby Ring"). Esmerian embezzled this item and later testified falsely about it to conceal his crime.

Specifically, at the time he pledged the Burma Ruby Ring to Merrill Lynch, Esmerian represented that it was worth $2.94 million based on historical cost. Because the Burma Ruby Ring was owned by one of the Fred Leighton Debtors, it became Debtor Property on April 15, 2008, when Esmerian caused the Fred Leighton Debtors to file a petition for relief in Bankruptcy Court.

In approximately the summer of 2008, in violation of the Bankruptcy Court Orders, and without notice to the Bankruptcy Court or Merrill Lynch, Esmerian sold the Burma Ruby Ring for $2 million to Dealer-1, which paid the entire $2 million by wire transfer to Esmerian's personal bank account on July 2, 2008. By that time, Dealer-1, who continued to share office

space with Esmerian, was the Chairman of the Unsecured Creditors' Committee in the Fred Leighton Bankruptcy Proceeding.

In an effort to conceal his embezzlement of the Burma Ruby Ring, Esmerian testified falsely about the Burma Ruby Ring during the Esmerian Deposition. Specifically, on June 19, 2009, more than one year after he sold the Burma Ruby Ring to Dealer-1, Esmerian falsely testified that the Burma Ruby Ring was then located in a vault at REI's office in Manhattan, and that Esmerian "had an offer" that Esmerian "turned down yesterday" from a potential buyer to purchase the Burma Ruby Ring for "$2 million."

6. The Sarah Bernhardt Necklace and Other
   Collateral Double-Pledged to Acorn

Esmerian also double-pledged collateral between Acorn and Merrill Lynch. Specifically, in connection with a loan of approximately $40 million by Acorn to REI (the "Acorn Loan"), on December 15, 2006 and December 17, 2007, in violation of the Merrill Lynch Agreements, Esmerian pledged certain items of Merrill Lynch Collateral to Acorn. In connection with the Acorn Loan, Esmerian falsely represented and warranted to Acorn that Esmerian, REI and/or other Esmerian-related entities owned such items of jewelry free and clear of any and all liens or claims of others. These items, which Esmerian represented to Merrill Lynch to have the values listed below based on historical cost, were as follows:

| Inventory No. | Description | Approximate Value |
|---|---|---|
| Tango M12706 (the "Sarah Bernhardt Necklace") | Lalique gold enamel necklace representing Sarah Bernhardt (Acorn Item No. 21). | $858,500 |
| Endymion MP3011 (the "Endymion Emerald and Diamond Necklace") | Emerald and diamond necklace (8 emeralds, 21.59 carats; 176 diamonds, 36 carats) (Acorn Item No. 57). | $630,000 |
| Tango NA.3663 | Gilded album commissioned by Marie-Antoinette in 1781 (Acorn Item No. 37). | $1,500,000 |
| Tango NA.3661 | Collection of antique Islamic rings and gems (Acorn Item No. 11). | $1,500,000 |
| Tango M12623 | Carved ivory, enamel and jeweled case by Boucheron, commissioned by Tsar Nicholas II in 1893 (Acorn Item No. 38). | $148,549 |
| Endymion M13346 | Byzantine revival gold and enamel paper knife, circa 1860 (Acorn Item No. 58). | $204,000 |
| Tango NA.3665 | One lot of Greco-Roman gold jewelry (Acorn Item Nos. 2, 43, 44). | $1,500,000 |
| **Total** | | **$6,341,049** |

In 2009, in violation of the Bankruptcy Court Orders, and without notice to the Bankruptcy Court, Merrill Lynch, or Acorn, in an effort to conceal his unauthorized double-pledging of collateral, Esmerian took the Sarah Bernhardt Necklace, which was at that time under the custody and control of Acorn, and placed it under the custody and control of Merrill Lynch. At the same time, in "exchange" for the Sarah Bernhardt Necklace, Esmerian transferred to Acorn the following two additional items of Merrill Lynch Collateral: the Endymion Emerald and Diamond Necklace (which Esmerian had previously also pledged to Acorn, as set forth in the preceding paragraph) and a particular emerald, ruby, pearl and diamond necklace with inventory number Endymion MP3135 (the "Emerald Elephant Necklace," which Esmerian had previously represented to Merrill Lynch to have a value of $420,000 based on historical cost).

In a further effort to conceal his secret and unauthorized transfer of the Sarah Bernhardt Necklace and other items of Merrill Lynch Collateral as set forth in the preceding paragraph, during his deposition, Esmerian gave false testimony and made certain admissions. Initially, among other things, Esmerian (a) admitted that, until recently, the Sarah Bernhardt Necklace had been in the possession of Acorn as collateral for the Acorn loan; (b) testified that, after the commencement of the Fred Leighton Bankruptcy Proceedings, in order to regain possession of the Sarah Bernhardt Necklace, which was an item of Merrill Lynch Collateral, Esmerian "traded" the Sarah Bernhardt Necklace with Acorn for certain other jewelry, including the Endymion Emerald and Diamond Necklace (the "Other Jewelry"); and (c) testified falsely that the Emerald Elephant Necklace was then located at REI's offices in Manhattan.

Subsequently, also during the Esmerian Deposition, Esmerian admitted the following: (a) contrary to his earlier testimony that the Emerald Elephant Necklace was then located at REI, the Emerald Elephant Necklace was, in fact, part of the Other Jewelry that Esmerian had given to Acorn in exchange for the Sarah Bernhardt Necklace; (b) Acorn had not, in fact, consented to Esmerian's "trade" of the Sarah Bernhardt Necklace for the Other Jewelry; and (c) although Esmerian had "traded" the Sarah Bernhardt Necklace (an item of Merrill Lynch Collateral) for the Other Jewelry (including items of Merrill Lynch Collateral) after the Fred Leighton Bankruptcy Proceedings had commenced, Esmerian never informed either Merrill Lynch or Fred Leighton's Chief Restructuring Officer of this "trade."

### III. DISCUSSION

A. <u>Applicable Law</u>

Section 3553(a) of Title 18, United States Code, provides that the sentencing "court shall impose a sentence sufficient but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth specific considerations, including: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; the defendant's need for

rehabilitation; the kinds of sentences available; and the sentencing range under the Guidelines. 18 U.S.C. § 3553(a).

The Guidelines range itself continues to be an important sentencing factor. Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall* v. *United States*, 128 S. Ct. 586, 594 (2007), the Court must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceeds. *Id.* at 596; *see also United States* v. *Rattoballi*, 452 F.3d 127, 133 (2d Cir. 2006) (the Guidelines "'cannot be called just 'another factor' in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors and, with important exceptions, their calculations were based upon the actual sentences of many judges.'") (quoting *United States* v. *Jiminez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006) (en banc)); *Kimbrough* v. *United States*, 128 S. Ct. 558, 574 (2007); *United States* v. *Crosby*, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that *Booker/Fanfan* and Section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge.").

B.  <u>Esmerian Should Be Sentenced Within the Guidelines</u>

The Government respectfully requests that the Court sentence the defendant within applicable Guidelines range of 97 to 121 months' imprisonment. Esmerian should receive such a sentence to reflect the seriousness of his offense, the history and characteristics of the defendant, to promote respect for the law, to afford adequate deterrence to criminal conduct, to protect the public from further crimes, and to avoid unwarranted sentencing disparities between similarly situated defendants. *See* 18 U.S.C. § 3553(a).

1.  <u>Seriousness of the Offense</u>

Plainly, Esmerian's fraud scheme was extremely serious given the value of the items he stole and the repeated and systematic nature of his false statements in sworn affidavits, sworn testimony, and in open court before United States Bankruptcy Judge Robert Drain. Esmerian's modus operandi was to steal a valuable item; lie about its whereabouts; and change his story and in the face of direct evidence contradicting his original false statement. As a result, Merrill Lynch and other creditors suffered not only losses in the tens of millions but also "sizeable unnecessary costs and expenses over a three-year period associated with uncovering the true facts concerning the disposition of millions of dollars of its collateral." *See* Merrill Lynch Letter to the Court. The letters from other victims further attest to the real economic impact of Esmerian's offenses. *See* Letter from Joseph C. Corneau (Counsel for Acorn Capital Group) to Wendy Olsen, June 23, 2011; Joshua Jericho Letter; Letter from Gail R. Zweig to the Honorable Denise L. Cote, July 13, 2011.

Esmerian's false statements were not merely a result of his being deposed in the bankruptcy process and testifying falsely because he was "[p]anic stricken and humiliated by what he had done." Esmerian Mem. at 25. Esmerian's false statements spanned a period of at least 23 months. Esmerian's false statements began at least as early as his December 8, 2008

affidavit concerning the Endymion Butterfly Brooch and extended as late as November 9, 2010, when, at meeting of creditors in this case, he testified falsely concerning his ownership of a Swiss bank account. *See* United States Trustee Letter to the Court.

In addition, in some cases, Esmerian's fabrications were sufficiently elaborate and sophisticated that they required advance planning. Particularly in the case of the Endymion Butterfly Brooch, as described in detail above, Esmerian's scheme involved the wholesale fabrication of a chain of transactions starting with the fictitious consignment of the Brooch to a Japanese dealer named "Diamond Kanko." These stories were not made up on the spot at the time of his deposition in June and August 2009. He began swearing to false affidavits describing the Diamond Kanko fiction in December 2008 and did not back down from these statements until late 2009, when he was faced with indisputable documents and affidavits that he could no longer explain away.

Esmerian's advance planning is also shown through the wholesale fabrication of at least three important documents:

- First, in connection with the Endymion Butterfly Brooch, he fabricated a consignment memorandum purporting to show that REI consigned the Endymion Butterfly Brooch to Diamond Kanko for $3.5 million on March 12, 2008.

- Second, in connection with the JAR Butterfly Brooch transactions, many months after Fred Leighton was in bankruptcy, Esmerian created and used a fake invoice to persuade the CFO of Fred Leighton to wire the proceeds of the sale to Omnis Industries, which he controlled, rather to Joshua-Jericho Associates/Individual-3, which owned the JAR Butterfly Brooch. Esmerian was the 100 percent owner and Chairman of Fred Leighton when he so deceived his CFO.

- Third, as described above, in connection with Esmerian's purported sale of the Jeweled Objects Emerald Ring, Esmerian created a fictitious handwritten invoice purporting to show the sale of the Jeweled Objects Emerald Ring to Individual-1, when in fact Individual-1 never bought or even considered buying the Jeweled Objects Emerald Ring.

  2.  <u>Deterrence and the Need to Promote Respect for the Law</u>

The need for general deterrence is a strong factor in favor of a Guidelines sentence in this case. On many levels, the bankruptcy process requires debtors to be transparent and candid about their assets and dealings. *In re Linda Vista Cinemas*, LLC, 442 B.R. 724, 734 (Bankr. D.Ariz 2010) ("Good faith is an inherent requirement which runs throughout the entire Bankruptcy Code . . . It is essential that bankruptcy proceedings be transparent, candid, and always operate in that spirit."); *In re Sharif*, 446 B.R. 870, 882 (Bankr. N.D. Ill. 2011) ("The public interest lies in maintaining a transparent, efficient bankruptcy system."). A Guidelines sentence will promote respect for this process and help deter others from abusing the bankruptcy process as Esmerian has.

### 3. History and Characteristics of the Defendant

On balance, Esmerian's personal history and family circumstances cut in favor of a Guideines sentence. As detailed in the Presentence Report, the defendant comes from a "close knit" and supportive family of means. He attended some of the best schools in the United States. He inherited his family's business from his father and represented its fourth generation. PSR ¶87-93; Esmerian Mem. at 3-4. He ran that business for decades before destroying it through the conduct that led to his conviction. Even assuming that Esmerian's experience running REI, a valuable small business, did not prepare him for the world of Merrill Lynch and Acorn Capital Group, nothing about that leap from one business world to another excuses or explains his conduct. The decisions that he made to repeatedly and systematically steal and lie when his financial situation deteriorated had nothing to do with his prior exposure to investment bankers and hedge funds. In fact, the business of museum-quality jewelry and art objects dealers that Esmerian worked in for decades is a world of handshake deals on credit, often for millions of dollars, where one's word is one's bond. This, and his solid upbringing and education, make his conduct particularly difficult to excuse.

The Government recognizes that Esmerian has made significant charitable contributions – particularly to the American Folk Art Museum – but not believe that this is a basis for a downward variance given the seriousness of his offenses. Esmerian made these contributions at a time when he had considerable wealth to give away. As of December 2006, Esmerian estimated that the inventory of REI, of which he owned 60 percent, had a value of approximately $192.3 million, giving him a net worth of over $115 million based on his business assets alone. For someone in Esmerian's position, charitable works, especially those that involve donations of money or that attract publicity, as Esmerian's contributions to the American Folk Art Museum have, are not entirely selfless acts but are intended in part to elevate one's position in society and foster the trust and respect of others. It is not uncommon for people of considerable wealth to engage in philanthropy; the ability to do so is an opportunity most criminal defendants, generally of more modest means, do not have. *See United States* v. *Repking*, 467 F.3d 1091, 1095 (7th Cir. 2006) (per curiam) ("[I]t is usual and ordinary, in the prosecution of ... white-collar crimes involving high-ranking corporate executives ... to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts."); *United States* v. *Kurland*, 2010 WL 2267509, at *2 (S.D.N.Y. May 26, 2010) (noting defendant's "significant contributions to his family and to the larger community," particularly his "involvement in his daughter's nonprofit organization, as well as his generous donations to St. Christopher's School for kids and other charities" but finding such contributions are "not uncommon in the world of white collar crime"; sentence was 27 months on a Guidelines range of 30 to 36 months). Esmerian should not be given an advantage over defendants who cannot make such donations of their time and money. *See United States* v. *Thurston*, 358 F.3d 51, 80 (1st Cir. 2004) (those "who donate large sums because they can should not gain an advantage over those who do not make such donations because they cannot"), vacated on other grounds, 543 U.S. 1097 (2005).

Many of the letters of support for Esmerian cite his charitable works, but the authors of the letters do not appear to be aware of the facts that supported Esmerian's conviction. Indeed, many of them appear to be unaware that Esmerian's charitable works provide yet another

example of his double-pledging.  One of the most valuable items that Esmerian promised to give the American Folk Art Museum – a painting titled the *Peaceable Kingdom* by Edward Hicks – had to be taken off the walls of the museum in 2008 because Esmerian had double-pledged it to Sotheby's.  According to news reports, Sotheby's foreclosed on the painting and was to auction it based on an estimated value of $6 to $8 million.

Esmerian's age is a factor in his favor, but not a significant one.  As an initial matter, the Probation Department does not highlight any significant health issues that would make it unduly burdensome for Esmerian to be incarcerated.  PSR ¶ 94-96.  Second, Esmerian's age does not distinguish him from a significant number of other fraud defendants who are sentenced in this Court.  Indeed, in many cases, white collar defendants do not have the opportunity to commit large-scale fraud until they have accumulated wealth later in life.  In this case, Esmerian's favorable reputation as an accomplished art-jewelry dealer and philanthropist, achieved over the course of his life, was undoubtedly a significant factor enabling him to acquire huge loans from Merrill Lynch and others in the first place.  He should not, therefore, be given a significant variance in his sentence on the basis of his age or his philanthropy.

    4.    <u>Forfeiture</u>

The Government respectfully requests that the Court enter a forfeiture order in the amount of $20 million, as charged in the Information.  At his plea hearing, Esmerian specifically allocuted to the fact that, after the filing of the bankruptcy petition in the Fred Leighton Bankruptcy Case, he sold at least $20 million worth of collateral without reporting it to Merrill Lynch.  Plea Hearing, *United States* v. *Ralph Esmerian*, April 15, 2011, at 18-19, 25-26.  That $20 million represents the forfeitable proceeds of Esmerian's fraud scheme regardless of whether Esmerian personally pocketed that entire amount.  *United States* v. *Baker*, 227 F.3d 955, 970 (7th Cir. 2000) (a forfeiture order may include a money judgment for the amount of money involved in an offense; the money judgment acts as a lien against the defendant personally for the duration of his prison term and beyond).

    5.    <u>Restitution</u>

The Government and the defense are attempting to reach an agreement as to restitution prior to sentencing, but have not yet done so.  The victims will be consulted if an agreement is reached, and the Court will be advised.

### III.  Conclusion

For the reasons stated above, the Government respectfully requests that the Court sentence Esmerian to a Guidelines sentence of 97 to 121 months' imprisonment.

                        Respectfully submitted,

                        PREET BHARARA
                        United States Attorney

By: _____
      David B. Massey
      Nicole W. Friedlander
      Assistant U.S. Attorneys
      (212) 637-2200

cc:    Patricia Pileggi, Esq.